**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

STATE OF NEW MEXICO, ex rel.,
GARY K. KING, Attorney General of
New Mexico,

      Plaintiff/Petitioner,

v.                     Docket No. _____

BYRON LEE LANDAU, an attorney and resident of Nevada;
CREDENCE LAW GROUP, INC, a dissolved Illinois corporation;
CREDENCE PROFESSIONAL GROUP, INC., a dissolved California corporation;
SCOTT MURAKAMI, a resident of California;
ARIYO MACKAY A/K/A CHRIS MACKAY, a resident of California;
VINCENZO S. AMMIRATO, II, an attorney and resident of California;
JOHN/JANE DOES 1 through 10; and
DOE CORPORATIONS 1 through 10;
BANK OF AMERICA, N.A., a nationally chartered bank (relief defendant);
AMERICAN EXPRESS COMPANY, a bank holding company (relief defendant);

      Defendants/Respondents.

**COMPLAINT FOR VIOLATIONS OF THE MORTGAGE ASSISTANCE RELIEF**
**SERVICES RULE (MARS RULE), THE NEW MEXICO UNFAIR PRACTICES ACT**
**(UPA) AND OTHER CLAIMS**
**AND**
**PETITION FOR INJUNCTIVE RELIEF**

COMES NOW, Plaintiff, the Attorney General of New Mexico ("AGO" *hereinafter*), and

upon information and belief for his complaint and alleges:

## I.    SUMMARY OF COMPLAINT

1.      Since at least 2012, Byron Landau, an attorney, and his non-attorney business

partners, have operated a mortgage relief enterprise which targeted distressed New Mexicans

who were seeking to save their homes from foreclosure. This enterprise, operated as "Credence

Law Group" ("Credence" *hereinafter*) by virtue of Landau's status as an attorney, has taken well

over one million dollars in illegal upfront fees from consumers. Through the enterprise,

Defendants convince consumers to enroll by falsely promising that Defendants will obtain a

favorable loan modification for the consumer in time to "save" the consumer's home from foreclosure and also states or implies that the consumers will receive legal representation.

2.      Credence and its principals have taken payments from at least nineteen (19) New Mexicans for these unlawful services and have directed into New Mexico an unknown volume of deceptive mailings to induce New Mexico consumers to pay Defendants, usually by electronic transfer directly into Defendants' operating bank account.

3.      Upon information and belief, over the course of 2013, Defendants' unlawful scheme brought in to the enterprise over $4 million from consumers across the nation.

4.      The Credence enterprise charges consumers varying amounts, typically a fee of at least $3,950.00 to start a "Legal Assisted Home Saver Program" which states or implies that the consumer is paying to receive legal representation and to receive assistance in obtaining a loan modification from his or her lender.

5.      Defendants also engage in deceptive conduct by using federal logos in their e-mail communications to consumers, including the Making Home Affordable ("MHA") and Federal Housing Administration ("FHA") logos, as well as the words "Fannie Mae" and "Freddie Mac," all of which tended to cause confusion regarding the sponsorship or affiliation between these entities and the enterprise.

6.      In an attempt to evade federal law and the ban on up-front fees for mortgage relief services, Defendants used a "sham" attorney in New Mexico ("Laurie M." *hereinafter*) to claim that an attorney licensed in New Mexico provided legal representation when, in fact, Laurie M. did not communicate with any Credence clients nor did she perform any legal work for the consumers.   Further, Landau used language in his retainer agreement that claimed the fee was not an "up front" fee but was earned in stages after certain work was completed.   For the reasons that follow, neither of these facts will permit Defendants to evade the law.

2

7.      Credence has lured New Mexico consumers into this scheme through the use of unlawful and deceptive mailings which stated or implied that the consumer could skip mortgage payments, implied that the consumer would obtain a two percent (2%) interest rate, used the name of the consumer's lender in violation of state law (NMSA 1978 §57-12-25) and/or identified the sender as "Loss Mitigation Administrative Office," failed to identify the mailing as attorney advertising, failed to disclose that Landau is not licensed to practice law in New Mexico and used the phrase "Home Affordable Modification Program" ("HAMP"), all of which caused confusion (or tended to cause confusion) and failed to contain the prominent disclosures required by the MARS Rule and state law.

8.      In reality, Defendants do little or nothing to actually assist consumers. Rather, in numerous instances, they direct consumers to avoid interactions with their mortgage lenders or servicers and, tragically, also direct consumers to stop making their mortgage payments.   In some cases, Defendants or their agents have told consumers that the payments made to the Defendants in lieu of the consumer's mortgage payment will be credited to the consumer's mortgage at the end of the process of a loan workout.   Such statements were false when made. When these consumers eventually discover that the enterprise has neither obtained a loan modification nor defended any foreclosure lawsuit, the consumers find themselves in default and sometimes lose their properties to the foreclosure.   These consumers reasonably believed that by paying an attorney, they would be receiving representation and competent aid in saving their homes.

9.      Even in the handful of instances where Defendants did obtain a loan modification for the consumer, it still charged an unlawful up-front fee and obtained the contract through unlawful solicitations.

10.     The AGO brings this action under both state law and Section 626 of the Omnibus Appropriations Act, 2009, 12 U.S.C. §5538, which permits the AGO to enforce the Mortgage Assistance Relief Services Rule ("MARS Rule"), 16 C.F.R. §322 (2010), re-codified as 12 C.F.R. §1015 (2011).   The AGO has reason to believe that residents of New Mexico have been adversely affected by Defendants' violations of the MARS Rule or are threatened with such violations.  12 U.S.C. §5538(b)(1).

11.     The AGO may seek injunctive relief, damages, restitution, and penalties for violations of the MARS Rule.  *Id.*

12.     Regulation O was promulgated for the express purpose of preventing consumer harm from mortgage assistance relief scams like the Credence enterprise because of a history of unfair and deceptive trade practices designed to take advantage of distressed and vulnerable homeowners.  *See* Mortgage Assistance Relief Services; Final Rule, 75 Fed. Reg. 75,092, 75,097-98 (Dec. 1, 2010).

13.     As set forth more fully below, Defendants have engaged in an ongoing, illicit mortgage relief scheme which preys on struggling and vulnerable New Mexico homeowners and which uses the allure of the protection of a law firm and attorneys to induce these consumers to extract significant payments from those consumers under the guise of legal representation.

14.     Defendants jointly and in coordination operate a common enterprise in order to carry out this scheme and trick homeowners into paying Defendants' fees.

## JURISDICTION AND VENUE

15.     This Court has subject-matter jurisdiction over this action because it is brought under federal consumer financial law and rules promulgated under such laws, 12 U.S.C. §5565(a)(1), and presents a federal question pursuant to 28 U.S.C. §1331.  (The MARS Rule is a rule enforced by the CFPB and is a "federal consumer financial law" as defined by 12 U.S.C. §

5481(14)).  The state law claims arise from the same acts or conduct of Defendants such that they are part of the same case or controversy and thus this Court may exercise supplemental jurisdiction of those claims pursuant to 12 U.S.C. §1367(a).

16.     Venue is proper in this District under 28 U.S.C. §§1391(b) and (c), and 12 U.S.C. §5552(a)(1).  The Credence enterprise conducts business in this District and a substantial part of the events giving rise to this claim took place in this District including mailings and communications directed into New Mexico and contracts entered into with New Mexico residents.

17.     The AGO has consulted with the Consumer Financial Protection Bureau ("CFPB") and provided notice as required by 12 U.S.C. §5552(b).

## PLAINTIFF

18.     Plaintiff/Petitioner Gary K. King is the duly elected Attorney General of the State of New Mexico.  The Attorney General has the statutory authority to enforce laws for the protection of the public, including the Unfair Practices Act, NMSA 1978, §57-12-1, *et seq.*, ("UPA" *hereinafter*).   NMSA 1978 §57-12-15.  The Attorney General also may enforce NMSA 1978 §36-2-27 barring the unauthorized practice of law.  NMSA 1978 §36-2-28.2.  The Attorney General can act on behalf of the state in all actions when the interests of the State require action in his judgment, including enforcement of the UPA.  NMSA 1978 §8-5-2(B).

19.     The AGO is authorized to bring an action to enforce the MARS Rule to seek rescission or reformation of contracts, the refund of moneys paid, restitution, injunctive relief, disgorgement or compensation for unjust enrichment, and civil penalties.  12 C.F.R. §1015.10. *See also* 12 U.S.C. §5552(a)(1) (allowing a state attorney general to enforce rules and regulations issued pursuant to Title XII such as the MARS Rule).

5

## **DEFENDANTS**

20.    Defendant Byron Lee Landau ("Landau" *hereinafter*) is an attorney licensed in California and has an inactive law license in Illinois – he is not admitted to practice law in New Mexico.   Landau is the front-man for the enterprise and as the attorney, he provides the appearance of legitimacy and professionalism to charge consumers for "legal services" even though he likely never performed any substantive legal work for any New Mexico consumer. Landau, directly and through the enterprise, offers, provides, or arranges for others to provide mortgage assistance relief services, as defined in Regulation O, 12 C.F.R. §1015.2, including but not limited to loan modification and foreclosure prevention services.   Upon information and belief, Landau is a resident of Nevada, although for the enterprise he often provided an address of "180 N. Stetson Avenue, Suite 3500, Chicago, Illinois, 60601."   However, this location appears to be a virtual office and not Landau's regular work location.

21.    Defendant Scott Murakami ("Murakami" *hereinafter*), a non-attorney resident of California, is the day-to-day manager and operator of the enterprise and upon information and belief he directs and operates the call center in Costa Mesa, California where the "legal work" for consumers is performed by staff with titles like "processor," "processing assistant" or "legal assistant."   He materially participates in the conduct of the enterprise's affairs. At all times material to this complaint, Murakami transacts or has transacted business in this District by directing communications into this District and by contracting with New Mexico consumers and directing the enterprise.

22.    Defendant Ariyo Mackay ("Mackay" *hereinafter*), also known as Chris Mackay, a non-attorney resident of California, is an individual who, directly and through the enterprise, offers, provides, or arranges for others to provide mortgage assistance relief services, as defined in Regulation O, 12 C.F.R. §1015.2, including but not limited to loan modification and

foreclosure relief services.   Upon information and belief, the enterprise pays or paid Mackay anywhere from approximately $30,000.00 to $50,000.00 per month.   Presumably any business would only make such payments in exchange for some material support or assistance to the enterprise by Mackay.   Such payments reasonably support the inference that Mackay is directly involved in the enterprise and/or provides material support.

23.   Defendant Vincenzo Salvatore Ammirato II ("Ammirato" *hereinafter*), an attorney licensed in California and a resident of California, established at least one bank account for the enterprise (Bank of America account ending in -2174) and in the account application identified himself as "President/Secretary" of Credence Professional Group, Inc.   He is also the registered agent of Credence Professional Group, Inc.   As "President" of the corporation, he presumably has managerial responsibility for the enterprise, actual control or at least the right to control the enterprise, and/or materially participates in the conduct of its affairs.   Ammirato has directly participated in the operation of the enterprise.   For example, on or about September 7, 2012, Ammirato opened the bank account to which consumers were directed to make payments to the enterprise via wire or electronic transfer.   At all times material to this complaint, Ammirato transacts or has transacted business in this District by and through the enterprise.

24.   Defendant Credence Law Group, Inc. is a dissolved Illinois corporation.   Upon information and belief, Landau was the agent of that corporation (and likely an officer).   Landau opened various bank accounts under the name Credence Law Group.   Those bank accounts were used or were likely used in connection with the enterprise, including the processing of payments. For example, on or about December 14, 2012, Landau completed and signed a Bank of America account application for a California "IOLTA" (lawyer trust account) ending in -9812 and which listed "Credence Law Group" as the law firm.   Victims of the enterprise later were directed to remit payments to this account via wire or electronic transfer.

7

25.    Defendant Credence Professional Group is a dissolved California corporation. Ammirato was its registered agent and Landau was likely an incorporator or officer. As noted above, consumers who were paying the enterprise were directed to remit payment to a bank account opened by Ammirato under the name Credence Professional Group, Inc. Upon information and belief, Landau, Ammirato and Murakami had access to or control over this bank account.

26.    Credence Professional Group and Credence Law Group are hereinafter referred to as the "Corporate Defendants." Upon information and belief, the Corporate Defendants operated jointly or in coordination in furtherance of the enterprise and are or were alter egos of each other.

27.    At a later time, the AGO may be able to identify other persons or corporations/ companies who engaged in unlawful conduct in connection with the enterprise and who should be named as defendants. At this time, such potential persons or parties are identified as John Doe/Jane Doe defendants 1 to 10 and Doe Corporations 1-10.

28.    Defendant Bank of America, N.A., is a nationally chartered bank and does business both nationally and in this District. It is named in this action only as a nominal defendant or "relief defendant" for purposes of securing assets or monies in the Bank's custody or control, which are the product of the unlawful enterprise operated by Defendants, and are not the property of the Company. The AGO does not allege any wrongdoing by the Bank but alleges only that it does hold or likely holds ill-gotten gains from the unlawful acts of Defendants including accounts ending in -2174 and -9812. The AGO anticipates seeking a freeze of such assets held by the Bank and which Defendants are likely to dispose of, dissipate, or remove and such action would cause irreparable harm to the AGO and to the consumer victims for whom the AGO seeks restitution. The AGO is aware of at several business accounts or lawyer trust

accounts which were opened by Defendants at the Bank in connection with Defendants' enterprise including accounts opened by Defendants Landau and Ammirato.

29.    Defendant American Express Company, is a bank holding company established under federal law, and does business both nationally and in this District.  It is named in this action only as a nominal defendant or "relief defendant" for purposes of securing assets or monies in the Company's custody or control, which are the product of the unlawful enterprise operated by Defendants, and are not the property of the Company.  The AGO does not allege any wrongdoing by the Company, but alleges only that it does hold or likely holds ill-gotten gains from the unlawful acts of Defendants.  The AGO anticipates seeking a freeze of such assets held by the Company and which Defendants are likely to dispose of, dissipate, or remove and such action would cause irreparable harm to the AGO and to the consumer victims for whom the AGO seeks restitution.  The AGO is aware of at least one account held by the Company, account ending in -3497, which is used or was used by Defendants to pay Defendant Mackay approximately $30,000.00 to $50,000.00 per month from the proceeds of the unlawful conduct by Defendants.

## CONSUMER ILLUSTRATION AND BACKGROUND

30.    An example helps depict how Defendant's scheme harmed New Mexico consumers, and took advantage of consumers' lack of knowledge and financial distress.

31.    Defendants induced New Mexico resident George S. to pay a total of $4,907.32 for legal representation and mortgage relief services starting on July 19, 2013.

32.    Unknown to George S., the foreclosure case against him was proceeding along during 2013 and continuing into 2014 at the same time he was paying $647.00 or more per month to Defendants.

33.     Unknown to George S., he had lost the foreclosure case by default at the same time Credence representatives were telling him that he should "not sweat it" and that he would have a modification offer "any day now" which would let him keep his home.  These statements were false when made because, in fact, Credence was not working diligently with George S.'s lender on any loan modification.

34.     George S.'s lender confirmed to the AGO that Credence had never submitted any application on behalf of George S. on or after July 2013, and had not submitted any communications to the lender regarding a loan modification.

35.     In fact, on September 23, 2013, the lender filed an affidavit with the court presiding over the foreclosure action that there were no loan modification or loss mitigation efforts underway.  This affidavit was filed two months after George S., started paying Credence for help to apply for a loan modification.

36.     Employees or agents of Defendants, including a "Brad Preston" induced George S., to pay and continue to pay Defendants even while he was in default by telling him, among other things, that:

a. He should pay Credence instead of his mortgage and those payments would be "held by" Credence to be applied to his mortgage when he obtained a loan modification.  He was assured by Preston that every penny that he paid Credence would "go towards" his mortgage.  This representation of course conflicts with the terms of the retainer agreement which states that the payments are for legal fees.  (George S., paid Credence every month thinking that the payments were being credited or accounted for by his lender, and he assumed a law firm would not be lying to him.)

b. He should "not worry" about any notices or demand letters from the bank or its attorneys – if he would just keep paying Credence, they would save his home and that

things were "looking good" on his loan modification because he was "almost at the end."

   c.  Preston could ensure that he would "lower his interest rate" on his loan, but that George S., would first have to pay Credence $1,500.00 to get started.

37.    In November 2013, the AGO received a complaint from New Mexico consumer Larry S., regarding Credence Law Group.  In his complaint, Larry S., stated that Credence charged him around $2,000.00 and promised him a new loan, but he could then not reach any representative.  He was able to stop payment on the checks he sent to Credence.

38.    The AGO engaged with Landau and Murakami to address Larry S.'s complaint, which on its face suggested MARS violations and other violations of law.

39.    Landau responded to the complaint and stated that an attorney licensed in New Mexico, "Laurie M.," was "local counsel" for Credence "on that matter."  Laurie M. later confirmed that she never spoke with Larry S., nor any other Credence client, except for one person who had called her to complain and who did not identify herself.

40.    Landau and Murakami for a time in late 2013 and early 2014 communicated with the AGO and remitted refunds to eight (8) of the nineteen (19) of the New Mexico consumers who paid the enterprise.  Eventually Landau and Murakami ceased communicating with staff of the AGO.

41.    The AGO brings this action to ensure that Defendants' unlawful conduct does not continue, and to seek restitution for the remaining un-refunded consumers plus civil penalties and costs.

## COUNTS 1-20:  MARS Rule (Regulation O) Violations against Landau and the Corporate Defendants

42.     In 2009, Congress directed the Federal Trade Commission to prescribe rules prohibiting unfair or deceptive acts or practices with respect to mortgage loans. 2009 Omnibus Appropriations Act, Pub. L. No. 111-8, §626, 123 Stat. 524, 678 (Mar. 11, 2009), as clarified by the Credit Card Accountability Responsibility and Disclosure Act of 2009, Pub. L. No. 111-24, §511, 123 Stat. 1734, 1763-64 (May 22, 2009).  Pursuant to that direction, the Federal Trade Commission ("FTC") promulgated the MARS Rule, 16 C.F.R. Part 322, all but one provision of which became effective on December 29, 2010. The remaining provision, Section 322.5, became effective on January 31, 2011.  All of the conduct in this case occurred after January 31, 2011. Section 1097 of the Consumer Financial Protection Act of 2010, 12 U.S.C. §5538, transferred rulemaking authority over the MARS Rule to the Bureau, which re-codified the Rule as 12 C.F.R. Part 1015, and designated it "Regulation O."

43.     Regulation O defines "mortgage assistance relief service" as "any service, plan, or program, offered or provided to the consumer in exchange for consideration, that is represented, expressly or by implication, to assist or attempt to assist the consumer with . . . [n]egotiating, obtaining, or arranging a modification of any term of a dwelling loan, including a reduction in the amount of interest, principal balance, monthly payments, or fees . . . ."  12 C.F.R. §1015.2 (2011).

44.     Regulation O defines "mortgage assistance relief service provider" as "any person that provides, offers to provide, or arranges for others to provide, any mortgage assistance relief service," other than the dwelling loan holder, the servicer of a dwelling loan, or any agent or contractor of such individual or entity.  12 C.F.R. §1015.2 (2011).

45.     Defendants are "mortgage assistance relief service provider[s]" engaged in the provision of "mortgage assistance relief services" as those terms are defined in Regulation O. 12 C.F.R. §1015.2 (2011).  Defendants, jointly or in concert, directly or indirectly, offered mortgage relief services to (and/or accepted or sought unlawful fees from) New Mexico consumers, including the following twenty (20) consumers:

a)  Yvette C., who paid Defendants $3,200.00.  Defendants ultimately issued a refund to this consumer.  ("Consumer 1," *hereinafter*)

b)  Ray L., who paid Defendants $2,950.00.  Defendants ultimately issued a refund to this consumer.  ("Consumer 2," *hereinafter*)

c)  Henry C., who paid Defendants $3,831.00.  Defendants ultimately issued a refund to this consumer.  ("Consumer 3," *hereinafter*)

d)  Michael B., who paid Defendants $4,450.00.  Defendants did not issue any refund to this consumer.  ("Consumer 4," *hereinafter*)

e)  Ursula H., who paid Defendants $3,649.00.  Defendants ultimately issued a refund to this consumer.  ("Consumer 5," *hereinafter*)"

f)  Javin T., who paid Defendants $3,950.00.  Defendants ultimately issued a refund to this consumer.  ("Consumer 6," *hereinafter*)

g)  Alfredo A., who paid Defendants $4,284.00.  Defendants did not issue any refund to this consumer.  ("Consumer 7," *hereinafter*)

h)  Larry S., who did not pay Defendants, but who contracted with them.   Larry S., submitted the first complaint regarding Defendants to the AGO in November 2013.  ("Consumer 8," *hereinafter*)

i)  Ann S., who paid Defendants $4,726.12.  Defendants did not issue any refund to this consumer.  ("Consumer 9," *hereinafter*)

j)   Felicia D., who paid Defendants $4,454.00.  Defendants did not issue any refund to this consumer.  ("Consumer 10," *hereinafter*)

k)   Anthony S,. who paid Defendants $1,500.00.  Defendants issued a refund to this consumer. ("Consumer 11," *hereinafter*)

l)   Jimmy N., who paid Defendants $8,694.64.  Defendants did not issue a refund to this consumer.  ("Consumer 12," *hereinafter*)

m)  George G., who paid Defendants $4,709.32.  Defendants did not issue a refund to this consumer.  ("Consumer 13," *hereinafter*)

n)   Jose R., who paid Defendants $913.25. Defendants issued refund to this consumer.  ("Consumer 14," *hereinafter*)

o)   Robert M., who paid Defendants $3,475.00.  Defendants issued refund to this consumer.  ("Consumer 15," *hereinafter*)

p)   Steven L., who paid Defendants $3,000.00.  Defendants issued refund to this consumer.  ("Consumer 16," *hereinafter*)

q)   William P., who paid Defendants $1,731.47.  Defendants did not issue any refund to this consumer.  ("Consumer 17," *hereinafter*)

r)   David M., who paid Defendants $3,106.000.  Defendants issued a refund to this consumer.  ("Consumer 18," *hereinafter*)

s)   Emilio D., who paid Defendants $6,825.08.  Defendants did not issue any refund to this consumer.  ("Consumer 19," *hereinafter*)

t)   Reynaldo C., who paid Defendants $2,436.00.  Defendants did issue a refund to this consumer.  ("Consumer 20," *hereinafter*).

46.   Regulation O prohibits any mortgage assistance relief service provider from requesting or receiving payment of any fee or other consideration until the consumer has

executed a written agreement between the consumer and the consumer's loan holder or servicer that incorporates the offer that the provider obtained from the loan holder or servicer.  12 C.F.R. §1015.5(a) (2011).   As to the twenty (20) above listed consumers, Defendants did request or receive a payment prior to the execution of a loan modification offer or agreement.

47.     Regulation O prohibits any mortgage assistance relief service provider from representing, expressly or by implication, that a consumer cannot or should not contact or communicate with his or her lender or servicer.  12 C.F.R. §1015.3(a) (2011).  As to the twenty (20) above listed consumers, Defendants did state or imply that the consumer should not communicate with his or her lender/servicer, both orally and in the written retainer agreements.

48.     Regulation O prohibits any mortgage assistance relief service provider from misrepresenting, expressly or by implication, that a mortgage assistance relief service provider is affiliated with, endorsed or approved by, or otherwise associated with the United States government, any governmental homeowner assistance plan, any federal, state, or local government agency, unit or department, any nonprofit housing counselor agency or program, or the maker, holder, or servicer of the consumer's dwelling loan.  12 C.F.R. §1015.3(b) (2011).  As to the twenty (20) above listed consumers, Defendants did misrepresent an affiliation with governmental programs or plans, including HAMP, MHA, FHA, Fannie Mae and Freddie Mac, by among other things, use of those words and logos on materials and e-mails provided to consumers.

49.     Regulation O prohibits any mortgage assistance relief service provider from misrepresenting, expressly or by implication, the consumer's obligation to make scheduled periodic payments pursuant to the terms of the consumer's dwelling loan.  12 C.F.R. §1015.3(b) (2011).  As to all or some of the twenty (20) above- listed consumers, Defendants did state or

imply that the consumer could "skip" mortgage payments without harm or default including, in part, based upon statements in the advertisements sent to these consumers.

50.     Regulation O prohibits any mortgage assistance relief service provider from failing to place a statement in every *general* commercial communication disclosing that: (1) the provider is not associated with the government and its service is not approved by the government or the consumer's lender; and (2) in cases where the provider has represented, expressly or by implication, that consumers will receive certain services or results, a statement disclosing that the consumer's lender may not agree to modify a loan, even if the consumer uses the provider's service. 12 C.F.R. §1015.4(a)(1)-(2) (2011). Regulation O requires these disclosures to be placed in a "clear and prominent manner," and when made in textual communications, they must "be preceded by the heading 'IMPORTANT NOTICE', which must be in bold face font that is two point-type larger than the font size of the required disclosures." When made orally or through other audible means, "the required disclosures must be preceded by the statement "Before using this service, consider the following information." 12 C.F.R. §1015.4(a)(3) (2011). As to the twenty (20) above listed consumers, Defendants did not include such a statement in the initial general commercial communication or solicitation.

51.     Regulation O prohibits any mortgage assistance relief service provider from failing to place a statement in every *consumer-specific* commercial communication: (1) confirming that the consumer may stop doing business with the provider or reject an offer of mortgage assistance without having to pay for the services; (2) disclosing that the provider is not associated with the government and its service is not approved by the government or the consumer's lender; and (3) in cases where the provider has represented, expressly or by implication, that consumers will receive certain services or results, disclosing that the consumer's lender may not agree to modify a loan, even if the consumer uses the provider's

service.   12 C.F.R. §1015.4(b)(1)-(3) (2011). Regulation O requires these disclosures to be placed in a "clear and prominent manner," and when made in textual communications, must "be preceded by the heading 'IMPORTANT NOTICE,' which must be in bold face font that is two point-type larger than the font size of the required disclosures." When made orally or through other audible means, "the required disclosures must be preceded by the statement 'Before using this service, consider the following information' and, in telephone communications, must be made at the beginning of the call."   12 C.F.R. §1015.4(b)(4) (2011).   As to the twenty (20) above-listed consumers, Defendants did not include such a statement in the consumer-specific communications, including Defendant's own retainer agreement.

52.     Regulation O prohibits any mortgage assistance relief service provider, in cases where the provider has represented that the consumer should temporarily or permanently discontinue payments on a dwelling loan, from failing to clearly and prominently state in close proximity to any such representation that the consumer could lose his or her home and damage his or her credit rating if the consumer stops paying the mortgage.  12 C.F.R. §1015.4(c) (2011). As to the twenty (20) above listed consumers, Defendants did not include such a statement in the initial general commercial communication or solicitation.   Misrepresenting in advertising the likelihood of obtaining relief, including a loan modification in violation of 12 C.F.R. §1015.3.

53.     Regulation O prohibits any mortgage assistance relief service provider, from stating or implying that the consumer will receive legal services.  12 C.F.R. §1015.4(c) (2011). As to the twenty (20) above listed consumers, Defendants did state or imply that the consumer would receive legal services or representation.

54.     Landau and the Corporate Defendants are therefore liable for at least twenty (20) violations (one per consumer).

17

55.     The Individual Defendants, Landau, Murakami, Ammirato, and Mackay are all also liable personally and individually because they either directly participated in these violations, had managerial control or oversight, and/or were willfully blind or recklessly indifferent to the unlawful conduct.

56.     The attorney Defendants Landau and Ammirato are not exempt from the operation of the MARS Rule.  The attorney exemption under MARS has two parts and neither Landau nor Ammirato qualifies under either part.

57.     First, an attorney may be exempt from the disclosure provisions only if he provides mortgage relief services as part of the practice of law, is also licensed to practice law in the state of the consumer's residence, and complies with all state laws and rules including the Rules of Professional Conduct and the UPA.  12 C.F.R. §1015.7(a).  Here, Landau was offering mortgage relief services arguably as part of his law practice (and Ammirato substantially supporting those efforts), but neither attorney is licensed in New Mexico, and Landau did not comply with all relevant rules and laws, such as by providing competent legal services.

58.     Secondly, an attorney may be exempt from the advance fee ban of the MARS Rule if he not only qualifies under the first exemption, but then also deposits any funds received from the consumer prior to performing the legal services in a client trust account, and complies with all state laws and regulations including licensing regulations, applicable to client trust accounts.  12 C.F.R. §1015.7(b).  Here, since neither attorney meets the first exemption, and thus do not qualify for the second, even assuming either attorney deposited funds into a client trust account.  Note that even if Landau placed funds into a client trust account, a non-refundable and unearned fee (like the ones charged here) are *per se* violations of the New Mexico Rules of Professional Conduct and thus he failed to "comply with all state laws and regulations" for such accounts.

59.     Landau and the Corporate Defendants are liable for restitution, disgorgement and civil penalties as provided for by the Consumer Financial Protection Act of 2010, the Federal Trade Commission Act, and such other relief as the court deems appropriate.

### COUNTS 21 to 40:  MARS Rule (Regulation O) Violations for the provision of Substantial Assistance as to Defendants Murakami, Mackay, Ammirato and any affiliate or John Doe/Jane Doe Defendant

60.     The above paragraphs are incorporated here by reference.

61.     Regulation O makes it unlawful for any person to provide "substantial assistance or support" to any mortgage relief service provider when that person knows or consciously avoids knowing that the provider is engaged in any act or practice in violation of the MARS Rule.  12 C.F.R. §1015.6 (2011).

62.     As to Consumers 1 to 20 above, Defendants Murakami, Mackay and/or Ammirato provided substantial assistance or support to Landau or the Corporate Defendants.

63.     For example, upon information and belief, Murakami operates and manages the call center located at 125 East Baker Road, Building D, Suite 155, Costa Mesa, California, 92626, which is the operational center of the enterprise.  (Upon information and belief, Landau is infrequently present at this call center and primarily works and resides in Henderson, Nevada.) Upon information and belief most or all of the books and records of the enterprise are kept at the Costa Mesa location and are not held by Landau in Nevada or Illinois.  Murakami is in direct and day-to-day control over the enterprise, including sales and marketing of the enterprise as well as oversight of the agents or employees who speak with the consumers.

64.     Murakami knew or should have known of the violations of law because in January 2013, he had signed a consent order with the State of Connecticut for similar violations of law in relation to mortgage relief services by a "State Law Group."  Thus he either knew or consciously avoided knowing that the enterprise was providing unlawful mortgage relief services

and this fact tends to show knowing and willful violations of law.  It is unknown whether Murakami operated the call center by or through a corporation or company, and the AGO reserves the right to add any such entity as a defendant as justified.

65.     So too, as to Mackay, the enterprise would not be paying him approximately $400,000.00 to $500,000.00 per year or more unless he was providing substantial assistance or support to the enterprise.  Such payments reasonably support the inference that he is providing substantial support or assistance to the business and/or is directly participating in the enterprise.

66.     So too, Ammirato, presumably as the President of a corporate participant in the enterprise is or was providing some substantial assistance or support to the enterprise.

67.     The AGO reasonably believes that discovery is likely to reveal other persons or entities who provided substantial assistance or support to Defendants, and each such Defendant is currently named as a Jane Doe or John Doe defendant to be identified by name at a later time.

68.     Wherefore Defendants Murakami, Mackay and Ammirato are all personally liable for violations of consumer protection laws as are the Corporate Defendants, including restitution and civil penalties.

### COUNTS 41 to 60:  UPA Violations for unlawful mailings by Defendants Landau, Murakami, and the Corporate Defendants

69.     The above paragraphs are incorporated here by reference.

70.     The AGO has obtained at least two sample mailings which Defendants directed into New Mexico as part of their marketing program or campaign.

71.     Those mailings are unfair and deceptive because, among other things, they:

        a.      Use the name of a consumer's lender or a loan amount without the prominent disclosures required by NMSA 1978 §57-12-25.

b.      Create ambiguity or confusion regarding the identity of the business, including use of the phrase "Loss Mitigation Administrative Office" and "HAMP."

c.      Omit the material fact that the offeror is a private law firm and fail to comply with New Mexico's attorney advertising ethical rules.

d.      Omit the material fact that the attorney, Landau, is not admitted to practice law in New Mexico.

e.      State or imply that the consumer's loan as "flagged" for internal review under HAMP and had been approved for a modification.

f.      State or imply that the offeror had made prior attempts to notify the consumer about a modification when that was untrue.

g.      State or imply that the consumer's loan could have a new payment of a specific amount when there was no reasonable basis to offer a specific new payment amount or to believe that the borrower would be approved for such an amount.

72.      At this time, it is unknown how many such mailings Defendants directed into New Mexico, but Defendants are liable for each such mailing.

73.      Upon information and belief, as the operational director of the enterprise, Murakami either knew or should have known of the content of the unlawful mailings which advertised the enterprise and generated customers for his enterprise.   His control and management of the enterprise reasonably supports the inference that he drafted or approved of such mailings or, if he did not do so, that he was recklessly indifferent to their content or willfully blind to their content.

21

74.     Upon information and belief, as the attorney at the helm of a law firm, Landau either knew or should have known of the content of the unlawful mailings which advertised the enterprise and generated customers for his enterprise.  His control and management of the enterprise reasonably supports the inference that he drafted or approved of such mailings or, if he did not do so, that he was recklessly indifferent to their content or willfully blind to their content.

75.     Defendants willfully engaged in the trade practices (sending deceptive mailings) and, as such, are liable for the maximum civil penalty under law.

76.     Upon information and belief, each of the twenty (20) New Mexico consumers who contacted Defendants were solicited via such a mailing, and thus Defendants are liable for a minimum of the twenty mailings for a potential fine of up to $5,000.00 each. NMSA 1978 §57-12-11.

77.     The AGO reserves the right to amend these claims or add claims based upon discovery into the volume of mailings.

### COUNTS 61 to 80:  Unauthorized practice of law against Defendant Landau and the Corporate Defendants

78.     The above paragraphs are incorporated here by reference.

79.     As to the twenty (20) consumer's described above, by and through the enterprise and the Corporate Defendants, Landau offered to and did engage in the unauthorized practice of law in New Mexico.  Even though Landau apparently ceded all operational control over the law firm to Murakami and others, he was the attorney offering to provide legal services to New Mexico consumers.

80.     A party may not engage in the practice of law in New Mexico unless he or she has been issued a certificate of admission by the New Mexico Supreme Court.   NMSA 1978 §36-2-27[1].

81.     The AGO may commence an action to prevent, stop or seek penalties for the unauthorized practice of law in New Mexico.  NMSA 1978 §36-2-28.2(A).

82.     In New Mexico, whether conduct constitutes the practice of law is determined on a case-by-case basis.  *State Bar v. Guardian Abstract & Title Co.*, 575 P.2d 943, 948, 91 N.M. 434, 439 (1978).  ("*State Bar*" *hereinafter*).

83.      If a party functions as an advocate for another person and gives legal advice, this clearly constitutes the practice of law.  *Chisholm v. Rueckhaus*, 1997-NMCA-112, ¶ 7, 124 N.M. 255, 948 P.2d 707.

84.     Out-of-court activities constitute the practice of law if they include the provision of legal advice or rendering a service that requires the use of legal knowledge and skill, including preparation of documents which secure legal rights.  *State ex rel. Norvell v. Credit Bureau*, 85 N.M. 521, 526, 514 P.2d 40, 45 (1973).

85.     Here, Landau by and through Credence Law Group offered a "Legal Assisted Home Saver Program" (or similar agreement) to at least twenty (20) New Mexico consumers through a written retainer agreement.

86.     These retainer agreements tended to cause confusion as to whether Landau would or would not defend any foreclosure lawsuit against the consumer.   The consumer could

---

[1] The New Mexico Supreme Court has enacted a similar rule which states that "[e]xcept as otherwise provided by the rule adopted by the Supreme Court, no person shall practice law in this state or hold himself or herself out as one who may practice law in this state unless such person is an active member of the state bar." Rule 24-101(A) NMRA.  By definition, a party licensed to practice law in New Mexico is a member of the state bar. *Id.*

reasonably think that she had hired or retained Landau and his law firm to save her home both through a workout and in any foreclosure proceeding.  For example, Section A-3 of the retainer states that if the consumer is in foreclosure, Credence will engage in "immediate negotiation" with the lender.  However, elsewhere in the retainer, the agreement states that the law firm will not represent the consumer in any lawsuit or court proceeding.  A consumer could reasonably believe this would include defense of the foreclosure through such "negotiation" by the attorney, but in any event, the consumers could and did rely upon Landau to render legal advice and counsel in relation to their home loans.

87.     Landau or his firm do offer or were offering to represent the consumers with their lenders, were or were offering to submit Qualified Written Requests ("QWR's") for the consumers, and to evaluate the consumer's loans to determine what loan modification options were "viable."

88.     Such offers, particularly in the context of the advertising and legal "flat fee" retainer agreements, are clearly offers to engage in the practice of law because Landau is to act as the advocate for the consumer and to provide legal analysis and evaluation.

89.     Landau is not admitted to practice law in New Mexico and he did not affiliate with any attorney licensed in New Mexico and who was actively involved in the representation.

90.     The local "sham" attorney, Laurie M., generally just received an e-mail to log on to an online portal with each New Mexico "case" and she would click "accept" or "approve" or a similar term to indicate that the case could proceed with Credence.  She would be paid a small fee on a per-case basis.  (Note that in the rule-making commentary of the MARS Rule, the use of local "sham" attorneys is described in detail and the attorney exemption was crafted narrowly to prevent such a sham attorney from being used to evade the law.)

91.     Landau is liable for a penalty of up to $5,000.00 per violation.  NMSA 1978 §37-2-28.2(C).

92.     The AGO hereby seeks a preliminary and permanent injunction to bar Landau and any of his firms or affiliates, including Credence Law Group, from engaging in the practice of law in New Mexico.  The AGO is not required to post a bond for a temporary injunction when seeking such an injunction.  *Id.*

93.     The AGO is not required to demonstrate irreparable harm when seeking an injunction to bar the unauthorized practice of law.  *State Bar*, 575 P.2d at 947, 91 N.M. at 438.

94.      Wherefore, the AGO seeks the maximum civil penalty and an injunction against Landau, the Corporate Defendants and any of Landau's employees, agents or contractors who hold themselves out to consumers as Landau's employees.

### COUNTS 81 to 100:  UPA violations for each consumer against Landau, Murakami, and the Corporate Defendants

95.     The above paragraphs are incorporated here by reference.

96.     As set forth above, the consumers who entered into transactions or contracts with Defendants were deceived in a variety of ways and various times, including through deceptive advertising, misrepresentations in phone calls or e-mails and material omissions in the contracts or solicitations.

97.     In addition to violating federal law, each such transaction with Consumers 1 to 20 constituted an unfair or deceptive trade practice under the UPA, in violation of NMSA 1978 §57-12-3 because they were false or deceptive statements knowingly made by Defendants in connection with the sale of services in the regular course of trade or commerce in New Mexico and which tended to deceive.

98.     These misrepresentations or omissions, for example, include the failure to disclose/material omission that Landau could not practice law in New Mexico, failure to disclose that payments to Credence would not be credited to the consumer's home loan, confusing language regarding the scope of the legal representation by Landau, use of exaggeration or innuendo over the sponsorship or affiliation with governmental or other programs or entities (including deceptive use of logos), and use of deceptive statements in the advertisements which did or tended to cause confusion.

99.     The acts, errors and omissions of Defendants were also unconscionable under the UPA, NMSA 1978 §57-12-2(E) because they:

a. Took advantage of the lack of knowledge, ability, experience or capacity of the consumers to a grossly unfair degree, including but not limited to representations that led consumers to believe that a sophisticated and licensed attorney would be protecting their interests; and

b. Resulted in a gross disparity between the value received by the consumer and the price paid, including charging often $3,000.00 and more to provided little or no assistance to a consumer in submitting a loan modification application which the consumer generally can do for free.

100.    For each such violation, Landau and the Corporate defendants are liable to the AGO for civil fines of up to $5,000.00 per violation and restitution.  NMSA 1978 §57-12-11.

101.    Landau is liable for these violations of the UPA because he directly participated in and/or managed the enterprise which engaged in the unlawful or deceptive conduct.

102.    Murakami is liable for these violations of the UPA because he directly participated in and managed the enterprise which engaged in the unlawful or deceptive conduct.

103.    The conduct by Defendants was both knowing and willful and thus the maximum penalty is justified for each such violation.

## INJUNCTIVE RELIEF

112.  Pursuant to Rule 1-066 NMRA, NMSA 1978 §36-2-28.2(A), and NMSA 1978 §57-12-8(A), the Attorney General seeks preliminary and permanent injunctions against Defendants to prevent continued violations of consumer protection laws by Defendants.  The AGO may seek to enjoin violations of federal law pursuant to 12 USC §5538(b)(1)(a).

113.    Pursuant to NMSA 1978 §57-12-8(A) and NMSA 1978 §36-2-28.2(A), the Attorney General shall not be required to post a bond when seeking temporary injunctive relief.

114. The AGO hereby seeks all injunctive relief that bars all Defendants from engaging in unfair and deceptive practices, violations of the MARS Rule, the unauthorized practice of law and from continuing to violate the UPA, as described above.

**WHEREFORE**, the Attorney General seeks a judgment and order against Defendants:

A. For restitution for each violation in amounts to be determined at trial.

B. For disgorgement of any and all unlawful earnings.

C. For civil penalties ranging from $5,000.00 to $1,000,00.00 per day for violations of the MARS Rule under the Consumer Financial Protection Act and/or up to $16,000.00 per violation under the Federal Trade Commission Act.

D. For a civil penalty of up to $5,000.00 per violation of the UPA pursuant to NMSA 1978 §57-12-11.

E. For a civil penalty of up to $5,000.00 per violation for the unauthorized practice of law pursuant to NMSA 1978 §37-2-28.2(C).

F. For costs pursuant to 12 U.S.C. §5565(b).

G. For such other relief as is deemed proper by the Court pursuant to 12 U.S.C. §5538(b)(1)(D).

H. For a temporary injunction, preliminary injunction and permanent injunction barring Defendants from engaging in the unlawful acts described above.

I. For such other relief as the Court deems just and proper.

Respectfully Submitted,

GARY K. KING,
ATTORNEY GENERAL


 /s/ David C. Kramer
Karen J. Meyers
David C. Kramer
Assistant Attorneys General
111 Lomas Blvd. NW, Suite 120
Albuquerque, NM 87102
505-222-9100 – voice
505-222-9033 – facsimile
Attorneys for Plaintiff/Petitioner

28